**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**
**NORTHWESTERN DIVISION**

| | |
|---|---|
| Carmen and Carol Wold, Cordell Wold, Edith Wold, Kris Wold, Kevin Wold, and Lyle and Melba Larson as Trustees of the Larson Family Nominee Trust, | ) ) ) ) **ORDER GRANTING DEFENDANTS'** ) **MOTION FOR SUMMARY JUDGMENT** ) |
| Plaintiffs, | ) ) |
| vs. | ) Case No. 4:12-cv-00043 ) |
| Zavanna, LLC, and Zenergy, Inc. | ) ) |
| Defendants. | ) ) |

Before the court is a motion for summary judgment filed by defendants (Doc. No. 21). After the motion was filed, the court held a hearing and allowed plaintiffs time to conduct additional discovery. The parties have since filed supplemental briefs and affidavits. Unless otherwise indicated, the facts set forth herein are uncontroverted.

**I.      BACKGROUND**

  **A.      The "Subject Leases"**

Plaintiffs have an ownership interest in the following tracts of real property located in McKenzie County, North Dakota:

Township 152 North, Range 97 West
  Section 6: Lots 2, 3, 4, 5, 6, 7, 8, 10 (less a 38.00 acre tract more fully described in Book 11, Page 221)

Township 152 North, Range 98 West
  Section 1: Lots 1, 2, 5, 6, 7, 8, 9, 10, 11, 12, SE/4

1

(the "Subject Property"). On February 9, 2005, each of the plaintiffs leased their mineral rights in the Subject Property to Diamond Resources, Inc. ("Diamond") by entering into one of six separate leases (leases or "Subject Leases"). Diamond subsequently assigned its interests in the leases to Zavanna. Zenergy later acquired an interest in certain of the leases.

The Subject Leases are all printed form leases that bear the notation: "PRODUCERS 88-PAID UP, Rev. 5-60 No.2." The primary term for each lease was three years with an option to extend the primary term for an additional two years, which option was exercised. This meant the primary term expired on February 9, 2010, absent either oil or gas being produced from the lease premises or defendants then being engaged in "drilling or re-working operations" given that the habendum clause in each of the leases read, in part, as follows:

> If, at the expiration of the primary term of this lease, oil or gas is not being produced on the leased premises or on acreage pooled therewith but Lessee is then engaged in drilling or re-working operations thereon, then this lease shall continue in force so long as operations are being continuously prosecuted on the leased premises or on acreage pooled therewith .
> . . .

### B. Pre-drilling development activity and completion of the Rolfsrud Well

No drilling took place on the Subject Property prior to the expiration of the primary term of the Subject Leases. However, Zenergy had obtained the necessary permits and regulatory approvals for the drilling of the Rolfsrud 7-6H Well ("Rolfsrud Well") and had engaged in other development activity before the primary term expired. In addition, Zenergy began drilling the Rolfsrud Well six days after the expiration of the primary term, with the well being completed in June 2010 and the first sales of gas and oil production occurring on June 16 & 17, 2010, respectively.

C. **Contentions of the parties**

Plaintiffs contend the Subject Leases expired because no drilling took place prior to the expiration of the primary term or, in the alternative, that the preliminary development activity was insufficient to hold the leases. They seek a judgment declaring that the Subject Leases are extinguished and of no further force and effect and monetary relief for the wrongful extraction of oil and gas after the claimed expiration of the leases.[1]

In response, defendants contend the development activity that took place prior to the end of the primary term followed by the drilling and completion of the Rolfsrud Well, together, were sufficient to extend the Subject Leases under the lease language quoted earlier.

II. **DISCUSSION**

A. **This court's and the Eighth Circuit's prior construction of the standard form "drilling or re-working operations" lease language**

Before turning to the claims in this case, it is helpful to first consider this court's and the Eighth Circuit's decisions in Anderson v. Hess Corp., 733 F. Supp. 2d 1100 (D.N.D. 2010), aff'd, 649 F.3d 891 (8th Cir. 2011). Much of what was decided in Anderson is ultimately dispositive here, given the similarity of the issues.

As in this case, the mineral-owner plaintiffs in Anderson claimed the leases in that case, which used the same "engaged in drilling or re-working operations" language in the habendum clause, had lapsed because defendant Hess Corporation ("Hess") had failed to commence drilling prior to the expiration of the primary lease term. Plaintiffs in Anderson, like the plaintiffs now in this case, had argued that the foregoing phrase should be read to require ongoing "drilling" or

---

[1] The complaint also contained claims related to the untimely payment of royalty to one plaintiff, but these were abandoned when the plaintiff agreed the unpaid royalty was the subject of title a dispute that justified the withholding of payment until it was resolved.

"reworking operations" at the expiration of the primary lease term in order to extend the lease and not "drilling operations" or "reworking operations." Or, to state it more directly, actual drilling was required to extend the lease and not simply engagement in "drilling operations."

This court rejected the Anderson plaintiffs' construction of the lease language, concluding that "engaged in drilling or re-working operations" should be read to mean engaged in either "drilling operations" or "re-working operations." In reaching this conclusion, the court observed that, although the North Dakota Supreme Court had not yet construed the language in question, it had provided some insight as how it likely would rule in Serhienko v. Kiker, 392 N.W.2d 808 (N.D. 1986). Specifically, this court stated:

> While the North Dakota Supreme Court has not specifically interpreted the phrase "drilling or re-working operations," it has cited case law that reveals the proper interpretation. In Serhienko v. Kiker, 392 N.W.2d 808 (N.D.1986), the North Dakota Supreme Court determined whether an oil company was engaged in re-working operations. The North Dakota Supreme Court cited to Alabama case law that held "principles for determining what constitutes 'drilling operations' are applicable for determining what constitutes 'reworking operations' in lease provisions." Serhienko, 392 N.W.2d at 812 (citing Sheffield v. Exxon Corp., 424 So.2d 1297, 1303 (Ala. 1982)). The lease at question in Sheffield contained language similar to the leases in this case:
>> If at the expiration of the primary term, oil, gas or other mineral is not being produced on said land, or on acreage pooled therewith, but Lessee is then engaged in drilling or reworking operations thereon ... the lease shall remain in force so long as operations are prosecuted with no cessation of more than sixty (60) consecutive days, and if they result in the production of oil, gas or other mineral, so long thereafter as oil, gas or other mineral is produced from said land or acreage pooled therewith.
> Sheffield, 424 So.2d at 1300 (emphasis removed) (omission in original). The Alabama Supreme Court explained:
>> Many oil, gas, and mineral leases now contain cessation of production clauses. These clauses generally provide for termination of the lease in the event that certain time periods expire without the operator or lessees having prosecuted "drilling" or "reworking" operations. Therefore, we intend to express guidelines as to what types of operations constitute drilling or reworking under Alabama law, but with the caveat that each case must be determined by its own particular facts.
> Id. at 1302. The Alabama Supreme Court thus read the phrase "drilling or reworking operations" as referring to "drilling operations" and "reworking operations." The North Dakota Supreme Court's favorable citation to Sheffield, indicates the phrase "drilling or re-working operations" includes "drilling operations" and "re-working operations."

4

> The Alabama Supreme Court's interpretation of the phrase is also supported by the plain language of the lease. * * * *[quotation of lease language omitted]. The use of the term "operations" after the phrase "drilling or re-working operations" indicates that "drilling" and "re-working" are adjectives that modify the noun "operations." The Plaintiffs do not cite any case law interpreting the phrase "drilling or reworking operations" so as to exclude "drilling operations." The Court finds the phrase "drilling or re-working operations" is not ambiguous and includes both "drilling operations" and "re-working operations." Thus, the Plaintiffs' contention that Hess Corporation had to be "engaged in drilling" to extend the leases beyond the primary term is without merit.

Anderson, 733 F. Supp. 2d at 1106-07.

In addition to concluding that ongoing "drilling operations" would extend the lease, this court also concluded in Anderson that "drilling" and "drilling operations" mean different things with the latter being a more expansive term. In particular, the court referenced the work of Professors Williams and Meyers with respect to how the terms "drilling" and "drilling operations" are used in the oil and gas industry, stating:

> Professors Williams and Meyers define the terms "drilling" and "drilling operations." "Drilling" is defined as the "[a]ct of boring a hole through which oil and/or gas may be produced if encountered in commercial quantities." Williams & Meyers, Manual of Oil and Gas Terms (2009). They define "drilling operations" as follows:
>> Any work or actual operations undertaken or commenced in good faith for the purpose of carrying out any of the rights, privileges or duties of the lessee under a lease, followed diligently and in due course by the construction of a derrick and other necessary structures for the drilling of an oil or gas well, and by the actual operation of drilling in the ground.

Id. at 1106. Later, the court made the same point relying upon this court's prior decision in Murphy v. Amoco Prod. Co., 590 F. Supp. 455, 458 (D.N.D. 1984) ("Murphy"), which discussed the meaning of "drilling operations," decisions from the other states, and Professor Summer's treatise on oil and gas law. Specifically, the court in Anderson stated:

> Hess Corporation contends it was engaged in drilling operations at the end of the primary term. As noted above, this Court has explained, "Drilling operations commence when (1) work is done preparatory to drilling, (2) the driller has the capability to do the actual drilling, and (3) there is a good faith intent to complete the well. It is not necessary that the drill bit actually penetrate the ground." Murphy, 590 F.Supp. at 458 (internal citations omitted). The Alabama Supreme Court held in Sheffield, "The key element" in

5

determining what constitutes drilling operations "is whether the operation is associated or connected with the physical site of the well or unit." Sheffield, 424 So.2d at 1302.

In Murphy, the oil company had staked and surveyed the well location, obtained a drilling permit, worked on the access road, moved a rig onto the site, drilled a hole for the conductor pipe, and was within hours of spudding the well when it was forced to stop by a temporary restraining order. Murphy, 590 F.Supp. at 458. This Court held these activities constituted drilling operations that extended the lease beyond the primary term, noting, "[S]pudding is not the only act which triggers an automatic extension such as the one in this lease. Defendant began sufficient preparatory acts a reasonable time before the expiration date." Id. at 459.

Courts in other jurisdictions have held activities similar to those conducted in Murphy to constitute drilling operations. See, e.g., Vickers v. Peaker, 227 Ark. 587, 300 S.W.2d 29, 31-32 (1957) (surveying and clearing site, constructing road, obtaining permit, bringing material onto site); Allen v. Cont'l Oil Co., 255 So.2d 842, 844-46 (La.Ct.App.1971) (digging slush pit, building road, drilling hole for conductor pipe); Johnson v. Yates Petroleum Corp., 127 N.M. 355, 981 P.2d 288, 290-91 (1999) (staking and surveying, obtaining permit, clearing site, working on road); Guleke v. Humble Oil & Ref. Co., 126 S.W.2d 38, 41-42 (Tex.Ct.Civ.App. 1938) (beginning to erect derrick, bringing pipe, a drill for digging water well, and other materials onto site). Professor W.L. Summers' treatise on oil and gas law explains the general rule:

> The general rule seems to be that actual drilling in unnecessary, but that the location of wells, hauling lumber on the premises, erection of derricks, providing a water supply, moving machinery on the premises and similar acts preliminary to the beginning of the actual work of drilling, when performed with the bona fide intention to proceed thereafter with diligence toward the completion of the well, constitute a commencement or beginning of a well or drilling operations within the meaning of this clause of the lease. If the lessee has performed such preliminary acts within the time limited, and has thereafter actually proceeded with the drilling to completion of a well, the intent with which he did the preliminary acts are unquestionable, and the court may rule as a matter of law that the well was commenced within the time specified by the lease.

2 W.L. Summers, Oil and Gas § 349 (1959).

Anderson, 733 F. Supp. 2d at 1107-08.

Finally, after reaching these conclusions, this court addressed whether Hess had engaged in "drilling operations" at the time of the expiration of the primary term of the leases, which for one of the leases was May 3, 2004. The court stated:

> Prior to the end of the primary term, Hess Corporation surveyed and staked a well, obtained a permit to drill from the Oil and Gas Division of the North Dakota Industrial Commission, leveled and lazered the pad, dug the drilling pit and lined it with gravel and clay, widened the access road to the well, drilled the rat hole for the main conductor pipe, moved equipment to the location, and drilled the mouse hole. See Docket No. 13. Hess Corporation performed work preparatory to drilling, and Hess Corporation's capability to do the drilling and good faith intent to complete the well are evidenced by the fact the

6

> company completed the well on June 30, 2009, and the well has continuously produced. See Murphy, 590 F.Supp. at 458 (explaining the elements of drilling operations). The Court finds, as a matter of law, that Hess Corporation engaged in drilling operations, thus extending the leases beyond the primary term.

Id. at 1108.

On appeal, the Eighth Circuit affirmed this court's interpretation of the "engaged in drilling or re-working operations" language, stating, among other things, the following:

> Finally, W.L. Summers's leading treatise on oil and gas law sets forth the general principle regarding drilling or reworking operations:
>> *Various provisions of an oil and gas lease make it necessary to determine what constitutes the beginning or commencement of a well or of drilling or reworking operations.... The general rule is that actual drilling is unnecessary,* but the location of well sites, hauling lumber on the premises, erection of derricks, providing a water supply, moving machinery on the premises and similar acts preliminary to the beginning of the process of drilling, when performed with the bona fide intention to proceed with diligence toward the completion of the well, constitute a commencement or beginning of a well or drilling operations within the meaning of the lease.
>
> 2 W.L. Summers, Oil and Gas § 15:19 (3d ed. 2008) (emphases added). Summers's general principle further supports our interpretation of the phrase "engaged in drilling or reworking operations." Thus, the district court correctly interpreted the disputed lease language and properly granted summary judgment in favor of Hess on the Andersons' quiet title claim.

Anderson, 649 F.3d at 898 (italics added). Also, the Eighth Circuit refused a request to certify to the North Dakota Supreme Court the question of how the lease language should be interpreted, stating:

> With respect to the question presented in this appeal, i.e., the meaning of the phrase "engaged in drilling or reworking operations," we decline to certify the Andersons' question because we do not believe that the issue is close. We further conclude that the North Dakota Supreme Court has provided enough guidance regarding the meaning of the disputed lease language to render our decision non-conjectural.

Id. at 895. Finally, in affirming this court's decision, the only question the Eighth Circuit did not address was whether Hess had engaged in "drilling operations" prior to expiration of the primary term of the leases because plaintiffs conceded that point on appeal. The court stated:

7

> The Andersons concede that Hess was engaged in drilling operations before the primary terms expired. Thus, we need not address whether the preparatory activities in which Hess engaged prior to the expiration of the primary terms constitute drilling operations.

Id. at 899 n.7.

### B. **Defendants' motion for summary judgment and the court's grant of additional time for discovery**

Defendants filed an early motion for summary judgment contending that this court's and the Eighth Circuit's decision in Anderson are controlling in this case. More particularly, defendants contended that, even though drilling had not commenced until some six days after expiration of the primary term, "drilling operations" were underway and the well was actually completed and started producing some four months later. The activities that had taken place prior to expiration of the primary term, according to defendants, included the obtaining of a well permit and other regulatory approvals, surveying, site-specific engineering, staking, and some initial site construction work.

In response to defendants' motion, plaintiffs argued that Anderson was wrongly decided and that the lease language required commencement of actual drilling prior to expiration of the primary term to hold the leases or, in the alternative, that at least equipment capable of drilling the well to completion needed to be present on site. Plaintiffs contended that they needed to complete discovery to ascertain exactly what had taken place prior to expiration of the primary term and whether defendants had proceeded in good faith and with diligent effort to complete the well. They argued that much of this information was in the control of defendants and could not be independently gathered. Plaintiffs specifically requested that they be given additional time under Fed. R. Civ. P. 56(d) to discover and marshal the evidence they claimed was unavailable to them.

After considering the arguments of the parties, the court concluded that a better record of what had actually transpired would be beneficial not only for this court's decision but also later in

the event of an appeal. Of concern to the court was that, while the occurrence of certain of the activities relied upon by defendants appeared to be undisputed (including when regulatory approvals were obtained, when drilling first commenced, and when the well was completed) because they were based upon public records, the proffered evidence of what physical work had been performed at the site prior to expiration of the primary term appeared to be conclusory with no indication of whether it was based on first hand knowledge or was simply hearsay. Further, if defendants were able to establish through more competent evidence that actual onsite construction activity had taken place prior to expiration of the lease term, this might obviate the need for the court to decide whether actual physical site work was required to hold the leases or whether the other preliminary work was sufficient such as permitting, site specific engineering, and/or staking.[2] Consequently, over the objection of defendants, the court allowed plaintiffs time for additional discovery but limited its focus initially to what had taken place at the well site prior to the expiration of the primary term and

---

[2] As noted earlier, the court in <u>Anderson</u> listed what the mineral developer had done in that case prior to the expiration of the primary term, stating:

> Prior to the end of the primary term, Hess Corporation surveyed and staked a well, obtained a permit to drill from the Oil and Gas Division of the North Dakota Industrial Commission, leveled and lazered the pad, dug the drilling pit and lined it with gravel and clay, widened the access road to the well, drilled the rat hole for the main conductor pipe, moved equipment to the location, and drilled the mouse hole.

733 F. Supp. 2d at 1108. Defendants here argued that, in light of this language, mere permitting would have been enough to hold the leases provided it was followed after the expiration of the primary term by continuous activity performed with reasonable dispatch leading up to the completion of the well. Hence, according to defendants, additional time for discovery was not required since there was no dispute over the fact that the well permit and other regulatory approvals had been obtained before the expiration of the primary term. The problem, however, is that this court did not say in <u>Anderson</u> that obtaining only a well permit prior to the expiration of the primary term would have been enough. Among other things, substantial physical activity had taken place at the wellsite prior to expiration of the primary term in <u>Anderson</u>, so that point did not have to be reached. Further, as already noted, the Eighth Circuit did not decide the point on appeal.

to whether the drilling and other activity thereafter had been more or less continuously prosecuted and with reasonable dispatch up to the time of completion of the well.[3]

Following the expiration of the time ultimately allowed for discovery, defendants proffered more competent affidavit evidence regarding (1) what actually had taken place at the drill site prior to expiration of the primary term and (2) the activity that took place thereafter leading up to completion of the well. Plaintiffs offered no countervailing evidence on these subjects.

C.   **The uncontroverted facts of this case**

   1.   **Prior to expiration of the primary term**

The uncontroverted evidence now before the court establishes the following took place prior to the expiration of the primary term of the Subject Leases, which was midnight February 9, 2010:[4]

---

[3] The court agreed with defendants that discovery directed primarily toward eliciting whether defendants had engaged in their pre-expiration activity with a bona fide intent to proceed with diligence in completing the well was likely unnecessary. This was because, unlike cases where the initial pre-expiration activity was followed by little or no activity and or a long period of time before well completion, the undisputed evidence before the court was that the drilling commenced on the sixth day following expiration of the primary term and, from all appearances, the work thereafter was continuously prosecuted and completed within a reasonable period of time. Over plaintiffs' objections, the court concluded that discovery directed primarily to eliciting the state of mind of defendants prior to expiration of the primary term would not initially be permitted but would be allowed later if the court concluded there was a legitimate question as to whether the activity after the expiration of the primary term was prosecuted more or less continuously and with reasonable dispatch, which turned out not to be the case.

[4] Plaintiffs argue that the primary term expired a day earlier, *i.e.*, at midnight February 8, 2010. However, each of the leases stated that the lease would remain in force for the specified number of years "from this date," which, in turn, was a reference to the date of the lease. Generally speaking, the commonly accepted rule for computation of time for a contractual deadline is to exclude the first day, but include the last, absent the parties having expressed a contrary intention. This includes contracts that use the terms "from" or "after" in describing when the period of time commences. See generally 74 Am. Jur. 2d Time §§ 15, 23, & 27 (database updated Nov. 2013); 86 C.J.S. Time §§ 16, 23 (database updated Dec. 2013).
   In applying similar lease language, a number of courts have followed this rule. See, e.g., Winn v. Nilsen, 670 P.2d 588, 590 (Okla. 1983); Wehran v. Helis, 152 So.2d 220, 227-30 (La. Ct. App. 4th Cir. 1963); Eastern Oil Company v. Coulehan, 64 S.E. 836, 839 (W.V. 1909). And, while it does not appear the North Dakota Supreme Court has explicitly ruled on the issue, it impliedly recognized the applicability of the general rule when it stated in Woodside v. Lee stated:
>    The oil and gas lease with which we are here concerned was executed on April 27, 1950. Under its terms the lease would terminate one year thereafter unless within that year the lessee commenced drilling operations or paid a delay rental of $16. No drilling operations were commenced nor was there any payment or attempt to make payment of delay rentals on or before April 27, 1951. It follows from what has been said above that the lease terminated on the expiration of *that day*.

- Zenergy submitted an application for authorization to drill a well on the Subject Property and for an expansion of the spacing unit to the North Dakota Industrial Commission ("Industrial Commission") on November 16, 2009.

- The Industrial Commission held a hearing on Zenergy's application on December 17, 2009. On January 25, 2010, the Industrial Commission granted Zenergy's request for the creation of a spacing unit on the Subject Property and for authorization to drill a well on the Subject Property.

- Uintah Engineering & Land Surveying, on behalf of Zenergy, completed a staking and survey of the wellsite for the Rolfsrud Well on or about January 16, 2010.

- Schlumberger Limited, on behalf of Zenergy, completed a drilling profile proposal for the Rolfsrud Well on or about January 22, 2010.

- Zenergy submitted Form lH Application for Permit to Drill Horizontal Well for the Rolfsrud Well to the Industrial Commission on January 25, 2010, and the application was approved and the permit issued on January 26, 2010.

- On January 28, 2010, Trotter Construction, Inc. ("Trotter") began moving equipment to the Rolfsrud Well site, clearing snow, and stripping and piling of topsoil. Trotter worked at the Rolfsrud Well site every day from that date through February 4, 2010. The work activity included continued hauling of equipment and materials to the site and preparation of the location for drilling by installing culverts and cattle guards, spreading scoria, and digging a reserve pit.

---

81 N.W.2d 745, 747 (N.D.1957) (italics added). In addition, this is consistent with North Dakota's adoption of the same rule for purposes of statutory deadlines (N.D.C.C. § 1-02-15) as well as for computing time in court proceedings (e.g., N.D. R. Civ. P. 6(a)(1)).

- On February 7, 2010, the Rolfsrud Well site was 100% ready for the drilling rig. Also as of that date, approximately 5% of the drilling rig and other equipment required for drilling had been moved onto the site.

### 2. After expiration of the primary term

After the expiration of the primary term of the leases on February 9, 2010, the uncontroverted evidence is that:

- Rig moving and erection continued and was completed on February 14, 2010.

- Cyclone Drilling, Inc. (Zenergy's drilling contractor) spud the Rolfsrud Well on February 15, 2010, the sixth day after the expiration of the primary term.[5]

- Drilling continued until the well bore reached bottom depth in April 2010.

- Following the completion of drilling, Zenergy completed and fracked the Rolfsrud Well, often working twenty-four hours per day, until oil first flowed on June 14, 2010. The first sales of gas and oil production occurred on June 16 & 17, 2010, respectively.

- The work activity that took place at the drill site after expiration of the primary term and leading up to first production was continuously prosecuted and completed with reasonable dispatch.

### D. The court's conclusion that Zenergy had engaged in "drilling operations" sufficient to hold the leases

The facts of this case are *materially* indistinguishable from those in Anderson with respect to what took place prior to the expiration of the primary term of the lease. As in Anderson, Zenergy

---

[5] "Spudding in" is the first boring of the hole in the drilling of an oil well. E.g., Anderson, 733 F. Supp. 2d at 1103 n.4 (citing Williams & Meyers, Manual of Oil and Gas Terms (2009)).

had obtained all of the approvals necessary to commence drilling and had engaged in actual on-site construction activity preparatory to drilling of the well that was more than *de minimis*. Further, as in Anderson, Zenergy's capability to do the drilling and good faith intent to complete the well are evidenced by the fact that it continuously prosecuted the work needed to complete the well with reasonable diligence. Consequently, for the reasons set forth in Anderson as well as the authority cited therein, the court concludes Zenergy's "drilling operations" extended the Subject Leases beyond their primary terms.

With that said, the court will turn briefly to plaintiffs' arguments for why defendants' summary judgment motion should be denied and why the court has rejected them.

### E.     Plaintiffs' arguments for why summary judgment should be denied

#### 1.     Plaintiffs' argument that the operative language requires actual drilling prior to expiration of the primary term to hold the leases

Plaintiffs argue that the North Dakota Supreme Court has still not ruled with respect to how the "engaged in drilling or re-working operations" language should be grammatically construed and, even if the relevant construction is that the word "operations" applies to both "drilling" and "reworking," what is meant by the term "drilling operations." Plaintiffs cite to authority that they claim construes the language in question to require actual drilling. In addition, plaintiffs argue that the relevant definition of "drilling operations" should be the one adopted by the North Dakota Legislature in N.D.C.C. § 38-11.1-03(2), which reads as follows:

> 2. "Drilling operations" means the drilling of an oil and gas well and the production and completion operations ensuing from the drilling which require entry upon the surface estate and which were commenced after June 30, 1979, and oil and gas geophysical and seismograph exploration activities commenced after June 30, 1983.

13

The problem with these arguments, however, is that the "ship has already sailed" regarding whether the operative language requires actual drilling, given this court's and the Eighth Circuit's decisions in <u>Anderson</u>. Further, even if the court could put aside its obligation to follow the Eighth Circuit's decision with respect to that point, the definition of "drilling operations" set forth § 38-11.1-03(2) was for an entirely different purpose, and there is no indication the North Dakota Legislature intended to legislate with respect to language used in oil and gas leases.

> 2. **Plaintiffs' arguments that the on-site activity that took place was insufficient to hold the Subject Leases even if actual drilling was not required**

Plaintiffs argue that, even if actual drilling was not required, the term "drilling operations" contemplates more than what took place in this case prior to expiration of the primary term. For authority, plaintiffs cite the following passage from this court's decision in <u>Murphy</u>:

> This Court finds that defendant did not trespass on plaintiff's property, because defendant's operations automatically extended the lease term. Drilling operations commence when (1) work is done preparatory to drilling, (2) *the driller has the capability to do the actual drilling*, and (3) there is a good faith intent to complete the well. See <u>Muth v. Aetna Oil Co.</u>, 188 F.2d 844 (7th Cir. 1951); <u>Geier-Jackson Inc. v. James</u>, 160 F.Supp. 524 (E.D.Tex. 1958); <u>LeBar v. Haynie</u>, 552 P.2d 1107 (Wyo. 1976). It is not necessary that the drill bit actually penetrate the ground. See <u>Humphrys v. Skelly Oil Co.</u>, 83 F.2d 989 (5th Cir. 1936).
> Prior to the expiration date of the primary term, defendant had undertaken substantial activities in preparation for spudding the well. The work had progressed so far that the preliminary drilling for the piping was done. A workover rig capable of spudding was in place and operating. And defendant had a good faith intent to complete the well, as evidenced by the advanced stage of drilling operations reached on the eve of expiration and by defendant's actually and timely completing the well.

590 F. Supp. at 458 (italics added and footnote omitted).

Plaintiffs argue that the italicized language required, at the very least, that the equipment needed to physically drill the well to completion be on the wellsite prior to the expiration of the primary term notwithstanding what this court decided later in <u>Anderson</u>, where the drill rig was not

14

on site prior to expiration of the primary term of at least one of the leases. Plaintiffs argue that what this court decided in Anderson with respect to that point was called into question when the Eighth Circuit stated in a footnote that it was not ruling on the issue of whether Hess in that case had performed sufficient activity to be "drilling operations."

The court rejects this argument for two reasons. First, Murphy is not inconsistent with what the court later decided in Anderson. While the facts in Murphy were that a drill rig was present prior to the expiration of the primary term, the court did not say in that case the physical presence of the drill rig was necessarily required. Rather, the court stated only that the driller have the "capability to do the actual drilling." In this case, as in Anderson, Zenergy had the capability of drilling the well since it had (1) obtained the necessary regulatory approvals, (2) had conducted onsite activity that was more than *de minimis*, and (3) had available to it the equipment (including a drill rig) required to drill the well. In fact, Zenergy commenced drilling on the sixth day following the expiration of the primary term and completed the well.

Second, even if Murphy should be read as narrowly as plaintiffs suggest, the court concludes that what this court decided in Anderson is more in accord with the prevailing authority. In fact, while the Eighth Circuit did not opine on what preparatory activity would be sufficient, the court did reference much of the same authority that was cited by this court on that subject, including the discussion in Summers, Oil and Gas, which suggests that having all of the equipment onsite needed to drill the well prior to expiration of the primary term is not required. Anderson, 649 F.3d at 898 (citing 2 W.L. Summers, Oil & Gas § 15:19 (3d ed. 2008)).

15

### 3. Plaintiffs' argument that "drilling operations" is ambiguous and that summary judgment is not appropriate because of the need to consider extrinsic evidence to what the parties intended by use of the term

Finally, plaintiffs argue that the term "drilling operations" is necessarily ambiguous because rationale arguments can be made for differing positions as to its meaning as evidenced by the fact that courts around the country are split over whether the term requires actual drilling, and even where not, over exactly where along a continuum of preparatory activities it actually commences. Plaintiffs then cite to North Dakota cases holding that, where contract language is ambiguous, the resolution of the ambiguity is a question of fact. Plaintiffs then argue that summary judgment is inappropriate because of the need for the factfinder to consider extrinsic evidence as to what the contracting parties in this case intended by use of the term.[6]

Also, as part of this same argument, plaintiffs contend that any suggestion in this court's decision in <u>Anderson</u> to the contrary is not binding, particularly since the Eighth Circuit restricted its affirmance only to the issue of whether "drilling operations" required actual drilling and since it must be determined in this case what preliminary activity short of actual drilling constitutes "drilling operations." Plaintiffs argue that the fact this court in <u>Murphy</u> and <u>Anderson</u> had to look to what other courts had decided was the meaning of the term "drilling operations," and did not confine its consideration to the "four corners" of the leases, further demonstrates the ambiguity of the term.

---

[6] Plaintiffs' correctly recite the general rules for construction of contracts under North Dakota law. Generally speaking, contract language is ambiguous under North Dakota law when reasonable arguments can be made for different positions as to its meaning. E.g., <u>Hillerson v. Bismarck Public Schools</u>, 2013 ND 193, ¶ 18, __ N.W.2d __. In addition, an ambiguity creates a question of fact to be determined with the aid of extrinsic evidence. <u>Id.</u>

Defendants argue that plaintiffs waived their "ambiguity argument" when they failed to raise it in their initial briefing. However, plaintiffs did argue in their initial briefing an interpretation of the term "drilling operations" contrary to that advanced by defendants, which is enough to have preserved the argument. Cf. <u>id.</u> at ¶ 16; <u>Home Instead, Inc. v. Florance</u>, 721 F.3d 494, 498 n.3 (8th Cir. 2013).

Again, the court disagrees. Among other things, plaintiffs' argument oversimplifies the process of contract interpretation when dealing with standard form agreements, particularly those replete with language reflecting the judicial gloss of prior court interpretations like the printed-form oil and gas leases at issue here. In construing agreements of this nature, courts frequently rely upon prior judicial constructions of the contract language, particularly when there has been no actual bargaining over the disputed language. Further, this is true even though the parties may not have intended the construction suggested by the existing case law and even though the case law may be in conflict. See, e.g., Kolbe v. BAC Home Loans Servicing, LP, __ F.3d __, 2013 WL 5394192, at *5 (1st Cir. Sept. 27, 2013) ("Kolbe") ("When a contract uses uniform language that is contained in a large number of contracts, as is the case here, it is a well-established common law principle of contract interpretation that such contracts are interpreted wherever reasonable as treating alike all those similarly situated, without regard to their knowledge or understanding of the standard terms of the writing.") (internal quotation omitted); Bank of New York Trust Co., N.A. v. Franklin Advisers, Inc., 726 F.3d 269, 276 (2d Cir. 2013) (under New York law boilerplate provisions of indenture agreements are given a consistent uniform interpretation and do not depend upon the particularized intention of the parties absent actual bargaining over the provisions); Continental Casualty Co. v. Wendt, 205 F.3d 1258,1262-63 (11th Cir. 2000) (stating that ambiguity is not invariably present when a contract requires construction and interpreting language in a standard form insurance policy in accord with the construction placed on that language by other courts); United States Fire Ins. Co. v. Schnackenberg, 429 N.E.2d 1203, 1205 (Ill. 1981) ("However, a term may be unambiguous because it has acquired an established legal meaning. [citation omitted] That is true here. Though this court has not had occasion to interpret the phrase, our appellate court and

a number of other jurisdictions have done so."); cf. Sauder v. Mid-Continent Petroleum Corp., 292 U.S. 272, 279-81 (1934) (looking to case law for the definition of an implied covenant of development in an oil and gas lease); see generally Restatement (Second) Contracts § 211(1)-(2) (1981); E. Allan Farnsworth, Farnsworth on Contracts § 7.11 (3d ed. 2004).

The law in North Dakota appears to be no different.[7] An example is the North Dakota Supreme Court's recent decision in Bice v. Petro-Hunt, L.L.C., 2009 ND 124, 768 N.W.2d 496. In Bice, the court was called upon to resolve a dispute between a mineral developer and a class of plaintiff mineral owners over the meaning of the term "market value at the well" in a standard form oil and gas lease used by the mineral developer. In resolving the dispute, the court observed that, while both sides initially claimed the term was unambiguous, they had ascribed a different meaning to it and that the class members later argued the term must be ambiguous if their interpretation was not adopted. Id. at ¶ 12. The court then reviewed the case law from other jurisdictions, noting that the "major treatises on oil and gas law demonstrate the unsettled nature of the law concerning the interpretation of the term 'market value at the well'" and that there were competing "majority" and "minority" positions as to its meaning. Id. at ¶¶ 13-16. The court then discussed why it found persuasive an Eighth Circuit decision applying North Dakota law that had adopted the majority position. Id. at ¶¶ 19-20. Finally, and only after consideration of these points, the court declared

---

[7] It appears the North Dakota Supreme Court has not yet specifically embraced Restatement of Contracts (Second) § 211. However, it has relied upon other parts of the Restatement Second of Contracts for authoritative guidance in numerous cases. E.g., Thimjon Farms Partnership v. First Intern. Bank & Trust, 2013 ND 160, ¶ 19, 837 N.W.2d 327 (citing § 90); Come Big or Stay Home, LLC v. EOG Resources, Inc., 2012 ND 91, ¶¶ 10-13, 816 N.W.2d 80 (citing §§ 204, 219-221). And, there is no reason to believe it would not consider § 211(1)-(2) to be authoritative in an appropriate case.

18

the term to be unambiguous, adopted the majority interpretation, and concluded that the trial court had not erred in granting summary judgment with respect to the issue. Id. at 21.

Also, and perhaps more to the point here, is the North Dakota Supreme Court's decision in Serhienko. As noted earlier, Serhienko addressed the same "drilling or re-working operations" language that appears in the leases in this case. In construing the "re-working operations" portion of the phrase, the court relied upon the construction afforded the term by other courts to conclude that "re-working operations" was broader than "re-working" and could include preparatory steps, such as testing, provided that the preparatory steps were followed by actual reworking activity performed with reasonable dispatch. Serhienko, 392 N.W.2d at 812-14. In so construing the term, the court said nothing about it being ambiguous as a matter of law.

In this case, plaintiffs have not proffered any evidence suggesting that the term "drilling operations" was the subject of actual negotiation between plaintiffs and the original lessee, Diamond Resources. That being the case, and with standard lease forms being used, what may have been the individual beliefs of plaintiffs and Diamond Resources as to the meaning of the term is immaterial. E.g., Kolbe, 2013 WL 5394192, at *5 ("Because uniform contracts are interpreted uniformly across cases whenever it is reasonable to do so, extrinsic evidence about what a particular party intended or expected when signing the contract is generally irrelevant."); see Restatement (Second) Contracts § 211(1)-(2); cf. National Bank of Harvey v. International Harvester Co., 421 N.W.2d 799, 804 (N.D. 1988) ( "It is the outward manifestations of assent which govern, not the secret intentions of the parties."). And, while plaintiffs have submitted affidavits from persons professing to be knowledgeable about oil and gas leasing practices (including an affidavit from one of the plaintiffs) who state that the term "drilling operations" as used in the industry means actual drilling, that

19

evidence is of little import here (even for the limited purpose of determining whether there is an ambiguity) since this court and the Eighth Circuit have already reached a contrary conclusion based on decisions of other courts and respected treatise authority. In fact, to consider anew the meaning of the term in each case would undermine the benefits of uniform interpretation and certainty of meaning that come with using standard form agreements of this kind. See id.[8]

### III. CONCLUSION AND ORDER

Based on the foregoing, the court concludes Zenergy engaged in "drilling operations" sufficient to extend the Subject Leases beyond their primary term. Consequently, defendants' motion for summary judgment (Doc. No. 21) is **GRANTED** and plaintiffs' complaint is **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED.**

Dated this 31st day of December, 2013.

/s/ Charles S. Miller, Jr.
Charles S. Miller, Jr.
United States Magistrate Judge

---

[8] Mineral owners contemplating executing similar lease agreements, but who are dissatisfied with the judicial interpretation placed on the standard form language "drilling or re-working operations," are always free to negotiate other language, *e.g.*, striking the language in question and inserting language requiring some other benchmark, such as actual drilling, or including a definition of "drilling operations" that accomplishes the same thing.